FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
12/30/2014 4:37:57 PM
KEITH E. HOTTLE
Clerk

# APPENDIX - TAB C

# In the Matter Of:

## SALAS VS. C&B WHITE SERVICES

13410

## CASEY WHITE

*January 16, 2014*

EXHIBIT **C**



800.211.DEPO (3376)
EsquireSolutions.com

## Page 1

CAUSE NO. 13410

MARISELA G. SALAS, individually AND AS REPRESENTATIVE OF THE ESTATE OF MARTIN SUAREZ AND AS NEXT FRIEND OF KEYLA MARIZEL SALAS SUAREZ, minor     *   IN THE DISTRICT COURT OF

VS.     *   GILLESPIE COUNTY, TEXAS

C&B WHITE SERVICES, INC., ALLEN KELLER CO., 1 LLC d/b/a ALLEN KELLER CO.; ALLEN KELLER CO. SAFECO INSURANCE COMPANY OF AMERICA     *   216TH JUDICIAL DISTRICT

\* \* \* \* \* \* \* \* \* \* \* \*
ORAL/VIDEO DEPOSITION
OF
CASEY WHITE
JANUARY 16, 2014
\* \* \* \* \* \* \* \* \* \* \*

## Page 2

ORAL/VIDEO DEPOSITION OF CASEY WHITE, produced as a witness at the instance of the Defendant, Allen Keller, and duly sworn, was taken in the above-styled and numbered cause on the 16th of January, 2014, from 3:00 p.m. to 5:03 p.m., before RHONDA HOWARD, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Zachary P. Hudler, P.C, 100 East Pecan, Suite 1, Johnson City, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

## Page 3

APPEARANCES

FOR THE PLAINTIFFS:

Mr. Michael G. Sawicki
SAWICKI & LAUTEN, LLP
4040 N. Central Expressway, Suite 850
Dallas, Texas 75204
(214) 468-8844
msawicki@sawickilauten.com

FOR THE DEFENDANT, ALLEN KELLER CO., ET AL:

Mr. Erik R. Wollam
LUCERO WOLLAM, PLLC
13590 Ranch Road 12
Wimberley, Texas 78676
(512) 485-3500
ewollam@flwlawfirm.com

FOR THE DEFENDANT, C&B WHITE SERVICES, INC.:

Mr. Zachary P. Hudler
LAW OFFICES OF ZACHARY P. HUDLER, P.C.
100 East Pecan, Suite 1
Johnson City, Texas 78636
(830) 868-7651

THE VIDEOGRAPHER:

Ms. Shari Riddle

## Page 4

INDEX

| | | |
|---|---|---|
| Appearances | | 3 |
| Change Page | | 107 |

EXAMINATION

| | | |
|---|---|---|
| Examination by Mr. Wollam | | 5 |
| Examination by Mr. Sawicki | | 44 |

| | | |
|---|---|---|
| SIGNATURE SHEET | | 108 |
| REPORTER'S CERTIFICATION | | 109 |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 5 | CONTRACT, KELLER AND C&B WHITE SERVICES, INC. | 11 |
| 6 | ESTIMATE | 12 |
| 7 | OSHA REPORT | 76 |

Page 5

(3:12 p.m.)

THE VIDEOGRAPHER: This is the videotaped deposition of Casey White in the matter of Marisela Salas versus C&B White Services, et al. The deposition is being held at the Law Offices of Zachary Hudler in Johnson City, Texas, on January 16th, 2014 at 3:12 p.m.

I am Shari Riddle, the videographer.

The court reporter is Rhonda Howard.

Counsel, will you please introduce yourselves and affiliations, and the witness will be sworn.

MR. SAWICKI: Michael Sawicki on behalf of Martin Suarez.

MR. HUDLER: Zach Hudler on behalf of C&B White Services, Inc.

MR. WOLLAM: Erik Wollam for the Allen Keller companies.

CASEY WHITE, having been duly sworn, testified as follows:

THE REPORTER: Thank you. We're on the record.

EXAMINATION
BY MR. WOLLAM:

Q   Please tell us your name.

Page 6

A   Casey White.

Q   Mr. White, give us a little background on yourself, please.

A   Johnson City, 33 years old. And what do you want to know?

Q   It was about that broad.

A   Okay.

Q   Where are you from?

A   Here we are.

Q   Okay.

A   Downtown Johnson City.

Q   Okay. Where are you from? You're from Johnson City.

Go to high school here?

A   Yes, sir.

Q   Education beyond high school?

A   Oh, tried a little college, didn't work out.

Q   Okay. What do you do for a living?

A   Well, as of now, I'm a ranch foreman outside of town.

Q   Okay.

A   And before that I had a small concrete company.

Q   C&B White Services, Inc.?

Page 7

A   Yes, sir.

Q   How long was that entity around?

A   I believe three or four years. I'd have to look at the date of filing, but three or four years.

Q   And you described it as concrete work. I assume it also included work on roadway projects as a subcontractor?

A   Yes. We -- I mean, I -- we did not do roadwork. We -- if there was a need for concrete on the roadway, yes, we could do that, but asphalt dirt was not our forte.

Q   Right.

And then as we apply it to the job on 1623, which is the subject of this litigation, your concrete work involved off the paved roadway pouring of concrete underneath the -- the guardrail barriers?

A   Right. It's called MO strips is what it's called. States wanted to save money. They put a two-foot strip underneath the guardrail so therefore they don't have to have weed eaters come back in and weed eat. They can just -- their shredders can run it.

THE REPORTER: It is called what?

Page 8

THE WITNESS: MO strip.

THE REPORTER: M-O?

THE WITNESS: M-O like mowing your yard.

THE REPORTER: Okay.

Q   (By Mr. Wollam) Tell me about your history of your relationship doing this kind of work underneath your company name. How long had you been doing it, since the inception of the company?

A   Well, since the inception of the company. We started out doing driveways and sidewalks and did some homes and got -- did some parking lots, and that's where we got to where we liked doing the State work more.

Q   Paid better?

A   Well, not only that, it's -- when you have homeowners they want to draw you a picture and say, "Build this." And it doesn't end up, and it's a lot better with a set of plans that are engineered and everything's to grade.

We don't do grade work, so when you do State work, the majority of the time it's to grade. You come in, set your -- what -- however they spec it out. It's just...

Q   When you're doing roadway work the State,



Page 9

TX-DOT, is going to give you some very specific instructions on how to do your work and it's easy to follow. Is that a fair assessment?

A  Well, I get a set of plans. I don't get it from TX-DOT. I'm not a TX-DOT contractor, but the general that I get it from, yes.

Q  And when it relates to roadway work, did you do work for folks other than Allen Keller?

A  Roadway work, no, sir.

Q  Okay. So the only -- within the concrete work, the only time you were doing anything associated with roadway work like what was involved with this would be through Allen Keller as a subcontractor?

A  Through -- that I've done in my concrete career, yes.

Q  Okay. And separate and apart from your C&B White Services, did you have experience doing any roadway work in any other capacity --

A  No, sir.

Q  -- in your work history?

Okay. Never worked for Allen Keller, I take it?

A  No, not -- not as an individual working for the company of Allen Keller, no, sir.

Page 10

THE REPORTER: Make sure you let him finish. Okay?

THE WITNESS: (Witness nods head.)

Q  (By Mr. Wollam) How many Allen Keller subcontracting jobs had you done before the job that's at issue?

A  I believe it's one, but that's kind of misleading.

We did one at a winery that was not a TX-DOT job. And then we started on one in Fredericksburg, did some stuff for them out by Euless, but I'm almost certain that that is on the same contract as the Blanco job.

Q  What did you call this job that's involved in this? What did you call it?

A  Blanco job.

Q  How long were you engaged in this particular job?

A  It roughly took us, I think, a month and a half, two months to do.

Q  And I assume there was no other crews other than Moreno's crew?

A  Correct.

Q  Next exhibit in the row with what we've been doing today is Exhibit 5. I'm attaching a copy

Page 11

of the construction contract between C&B White Services, Inc. and Allen Keller.

(Deposition Exhibit No. 5 marked)

Q  (By Mr. Wollam) Take a quick look at it, if you would, and confirm for me that this is the written contract you entered into. I think it's November of 2011. Is that correct?

A  Yes, sir, that's what it says.

Q  And does this relate to the Blanco job you just described?

A  Yes and no.

That's where I was telling you that this -- when we initially signed this, this was part of the Fredericksburg there in front of Euless. I believe that's Tyvidale.

Q  Okay.

A  But they lumped it under the same job.

Q  Got it.

A  So I'm not really sure...

Q  You -- when you entered into a written contract with Allen Keller, the first work that you performed location-wise was out in Fredericksburg area?

A  Yes, sir.

Q  Okay. And then underneath the same

Page 12

project, for using a broad term, you were doing the Blanco work --

A  Yes, sir.

Q  -- as a subcontractor to Allen Keller?

A  Yes, sir.

Q  And it's the Blanco work that was involved in the accident --

A  Yes, sir.

Q  -- we're talking about.

Now, you've -- through your attorney have produced Exhibit 6. Just tell what that is.

(Deposition Exhibit No. 6 marked)

A  This is an invoice to Allen Keller.

Q  (By Mr. Wollam) Is it an invoice or a estimate? The upper right-hand corner --

A  I'm sorry. Yes, sir. You are correct.

THE REPORTER: You've got to let him finish.

THE WITNESS: I'm sorry.

THE REPORTER: That's okay.

A  Yes, sir, you are correct. That is.

Q  (By Mr. Wollam) What's the date of that estimate?

A  That is November 18th.

Q  And is that just a few days before the

Page 13

signature on the written contract that's Exhibit 5?

A   I really don't know. It doesn't clarify here. It says 2722 -- or 27, 22nd day of November 11th [sic].

MR. SAWICKI:  That was one of my questions.

Q   (By Mr. Wollam) Yeah. I see --

MR. SAWICKI:  We may not have gotten that.

Q   (By Mr. Wollam) -- I see your point on Page 1 of 11.

I'll tell you what -- let's see. On the signature page, Page 8 of 11 of the contract, which is Bates stamped Allen Keller Company 15, does that help us --

A   Yes, sir.

Q   Okay. And what -- what's -- on the signature page, what's the date that it appears to have been signed?

A   22nd of November, 2000 --

Q   So four days after the estimate?

A   Yes, sir.

Q   Okay. Does the estimate that you're looking at, Exhibit 6, also relate to the concept of the work to be done in Fredericksburg?

Page 14

A   Yes, sir.

Q   And as I read this there is an exclusion related to traffic control?

A   Yes, sir.

Q   And just for purposes of being very broad, when you hear the term traffic control as it relates to your experience doing roadway work, what's it mean?

A   Traffic control is from signage to cones. It's anything dealing with traffic.

Q   Okay.

A   We were a concrete crew. We are not a traffic crew.

Q   Got it.

So when you started up and the estimate was provided, you weren't going to handle traffic control?

A   No, sir. Don't have the people. Didn't have the people.

Q   And that's when you're talking about the job in Fredericksburg?

A   And Blanco. This -- this estimate -- what this estimate is, your MO strip is your Blanco work.

Q   Yeah.

A   Your curb and gutter is Fredericksburg and

Page 15

your six-inch paving is Fredericksburg.

Q   Got it.

And then the next item on the estimate you're reading is --

A   The --

Q   What does it say?

A   "Allen Keller to do all traffic control."

Q   Okay. Now, between November of 2011 and the date of the accident in July of 2012, C&B White did take over traffic control work on the Blanco part of the job?

A   Yes. We were asked to.

Q   Okay. And you did?

A   Yes, sir.

Q   And you were paid for that work separate and apart from the estimates -- the estimate figures?

A   Yes, sir.

Q   And as I understand it, correct me if I'm wrong, you were paid a per diem, daily fee, for that scope of work?

A   I'm not understanding how you're putting per diem in there.

Q   Okay. How were you compensated? When -- when it became C&B's job to do the traffic control

Page 16

on the Blanco project, how were you compensated for that?

A   With money.

Q   Okay. And -- and how was it calculated? For what amount of fee or how would you be paid for it?

A   They said, "Do the work and bill us."

Q   Okay. And did you bill them --

A   Yes, sir.

Q   -- for a daily aspect?

A   Yes, sir.

Q   So once a day you had a fee established for if you're asking me to do this, you're going to pay me X dollars for it?

A   Yes.

Q   Okay. And when you do the concrete work associated with the Blanco job or the Fredericksburg, for that matter, you're getting a set of construction drawings through Allen Keller that begins from TX-DOT. Correct?

A   Yes. TX-DOT has -- engineers the job, basically.

Q   Yeah.

So the TX-DOT engineers create the set of construction drawings.



Page 17

You ultimately get a copy of those through Allen Keller?

A   Correct.

Q   Those drawings are what tells you and your crew where to place the concrete apron underneath the barricades and the dimensions?

A   Correct.

Q   When you take over traffic control, that is also a written plan that comes to you that's generated by TX-DOT and delivered through Allen Keller. Correct?

A   Correct.

Q   Okay.  So when it comes to that, you also have a TX-DOT-engineer-approved plan that you are to follow?

A   No.

Q   What do you --

A   It's a book.

Q   A book.  All right.

And within that book there's instruction --

A   Right.

Q   -- about how you're to place your traffic control devices?

A   Correct.

Page 18

Q   And then you're -- and what you've explained to us is that includes signs and cones?

A   Correct, traffic control.

Q   And you did follow that booklet instruction as to where to place signs and cones?

A   Yes, sir.

Q   Okay.  And before the Blanco project was that placement of signs and cones anything you guys had ever done at C&B White before?

A   No, sir.

Q   Okay.

A   We've --

Q   Go ahead.

A   We've had construction entrance signs, but never have we shut down lanes or anything like we did on Blanco.

Q   Okay.  And --

A   Therefore, why I did not bid on the work.

Q   Okay.  And once you're on site doing your work on the Blanco side of the project, there is a TX-DOT inspector present?

A   Correct.

Q   I am under the impression that he was there daily or frequently?

A   Frequently.

Page 19

Q   Okay.  And drove -- this is not -- this -- this job is strung out over a long distance.  Correct?

A   About six miles, yes, sir.

Q   Okay.  And he's got to traverse all of it?

A   Yes, sir.

Q   He's got to check other sections of the work, like all the way back to Fredericksburg?

A   That, I don't -- I didn't know if he was jumping from Blanco to Fredericksburg.

Q   Okay.  Maybe another inspector over there?

A   Correct.  That --

Q   But the same job?

A   Yes.

Q   Okay.  The TX-DOT inspector, as you understand it, was there to check your work as far as the concrete work?

A   And the roadway work being done.

Q   And the roadway work.

He would also check the signage --

A   Correct.

Q   -- and the traffic control to make sure it complied with the materials in the -- in the binder?

A   Correct.

Q   And did you ever get any indication from

Page 20

the TX-DOT man prior to the accident involving Martin Suarez that your crew had not placed traffic control appropriately?

A   Correct.

Q   Had you?

A   Yes.

Q   He did tell you something along --

A   He had mentioned that the spacing was not correct.

Q   For what part of the traffic control?

A   The signs --

Q   Okay.

A   -- and the cones.

Q   All right.  And when did you get that information from TX-DOT?

A   I don't recall.  I mean --

Q   Deliver --

A   Various days.

Q   -- delivered directly to you ultimately?

A   Him, as well as he would call a Keller representative and they would call me, as well.

Q   Okay.  And when those occurred did you rectify it by spacing it the way that the TX-DOT man wanted?

A   Correct.

Page 21

Q   And how many occasions do you believe that occurred?

A   Maybe twice. I mean, I would -- I would go to say twice.

Q   Okay. And it just has to do with how far back from the work area the signs were being placed?

A   Yes. It -- yes.

Q   Okay.

A   It was a very curvey road and it's...

Q   Follows the Blanco River?

A   And just because it's black and white doesn't mean -- I mean, you can be -- follow the spacing and you're right in a blind spot.

Q   Got it.

So you've got to back it around -- even though you're following the book as to how far back to place the sign --

A   Correct.

Q   -- what you're telling us is it may not do you any good because you're on a curve and you've got to back it up further?

A   And as well as if we would have it set exactly right he may move us further or closer to put us in a safer position --

Q   Got it.

Page 22

A   -- or further view for the oncoming traffic.

Q   Understood.

I'm going to assume - correct me if I'm wrong - that the TX-DOT man never had any criticisms about how your crew loaded the signs from the storage place at night and delivered them to the roadway?

A   No, sir.

Q   No, sir, I'm right?

A   He did not have any criticisms.

Q   Right.

A   Yes, you are correct.

Q   And correct me if I'm wrong. Your crew, once they're charged with the task of placing signs, they're picking them up at the end of the workday?

A   State mandate that you take down a sign every evening and put them up every morning.

Q   Right.

A   Cannot leave them up overnight.

Q   Right.

And it's to be -- the signs are to be placed when you're actually doing the work, the men are there present. Right?

A   Yes.

Page 23

Q   Okay. And then the signs are collected.

And we heard from Martin [sic] they were being stored close to the area where the accident apparently happened?

A   I'm not saying that day. Usually when you get done, you pick up signs. You lay them down. You get from one end, put them in where you pick up your last sign, lay them down, pick up the other end, put them down -- lay them down.

Q   In the right-of-way, the shoulder?

A   Yes, sir.

Q   Off in the bar ditch?

A   Yes, sir.

Q   Okay.

A   Usually try to keep them out of sight or anything so that nothing got stolen.

Q   Okay. So it's not like -- we shouldn't be left with the impression, as you understand it, that the morning of this accident the man had some designated material lot --

A   No.

Q   -- where they needed to collect these signs?

A   The only designated material lot on the job was at the other end, and that was not for stuff

Page 24

like that. That was material and rock and what have you.

Q   Got it.

So there really is no -- no one should have the impression that there's Allen Keller general contractor people hovering over the signage as it's being picked up or -- or laid down at the end of the day on a day-to-day basis by your crew?

A   Other than checking to make sure they were down, no, sir.

Q   Okay. Driving to make sure at the end of the day the signs were down?

A   Correct.

Q   Okay. It sounds to me like the only feedback you got on sign placement or traffic control placement came from the TX-DOT man?

MR. HUDLER: Objection; form.

Q   (By Mr. Wollam) Is that true?

A   No.

Q   You said from Allen Keller, but it sounded to me like it started with the --

A   The --

Q   -- the TX-DOT man.

A   I would say yes, I got a phone call from TX-DOT. Then I got a phone call from Allen Keller.



Page 25

Q Okay. And based upon -- it sounds to me like the two went together. The first call's from the TX-DOT inspector. And then you're getting an additional phone call from Allen Keller, who, it sounds to me like, also got a call from TX-DOT. And it's all feeding back to you asking you to do something a little different?

A I guess so. I mean, I don't know who called who, but I got -- I would get two phone calls if I would get one. So...

Q Okay. And on how many occasions did this happen?

A Like I said earlier, I would -- no more than twice. I mean...

Q And no one, whether it be TX-DOT or Allen Keller, had any criticisms of how your men were collecting signs and placing them down the roadway prior to beginning their work by placing them in the bed of the truck and driving and stopping and putting them out?

A No, sir.

Q At the inception of the Blanco work, other than the three being -- three-ring binder, what information did you get, if at all, about how to place cones and signs?

Page 26

A Really, the crew chief for Allen Keller helped us set up the first day and that was about how it went.

Q Okay. And who was that by name?

A Paul -- I'd have -- I have his phone number. I mean, I know him as Paul.

Q Okay. I think it's Carlisle. Does that ring a bell?

A Big -- big reddish-haired guy, yes.

Q So is this literally the first day your crew is -- is going to be doing the Blanco work?

A Yes.

Q Paul Carlisle says, "This is how you do it"?

A Yes, sir.

Q It's not complex, is it?

A No, sir.

Q You say, "I got it"?

A (Witness nods head.)

Q And from that day forward, you and your crew are handling it?

A Yes, sir.

Q With no criticism or input from Paul?

A No, sir -- well, other than --

Q The phone calls you just --

Page 27

A -- the phone calls. And then he was the one that would come get the cones from my guys.

Q Okay.

A From the --

Q I think what you're referring to is you've been able to sit through Mr. Moreno's testimony. And Mr. Moreno explained that there were two occasions where an Allen Keller man changed the spacing of the cones --

A Correct.

Q -- in the roadway. You're telling us that man is Paul Carlisle?

A Yes, and his crew, yes, sir.

Q Has Mr. Moreno -- prior to this job here on 1623, on the Blanco project, somebody worked for you before [sic]?

A He has done work for me, yes, sir.

Q Okay. I get the impression he's a reliable hand?

A He is. He knows the guys. He -- I don't -- I don't know those guys. I mean -- you know, it's -- he's the -- I -- I know him. And whatever different job has, he gets different guys.

I mean, just like that job, he would bring different guys.

Page 28

Q Your work history with him, do you consider him to have been safety conscious?

A Yes, sir.

Q Any significant injuries other than the event involving Mr. Suarez while he was doing work for you at any time?

A No, sir, other -- I mean, other than somebody trip or something, fall. I mean, that's...

Q It's construction work?

A Right.

Q I'm talking about some --

A No, nothing at all.

Q I mean, literally something that would require somebody to go to the hospital?

A Right. Not a car wreck, nothing -- I mean, nothing.

Q You weren't present at the time of the accident?

A No, sir.

Q You have no personal knowledge of what transpired?

A No, sir.

Q You have had to learn what took place through Mr. Moreno and what he reported to you?

A Correct.

Page 33

respect to your work on the Blanco side of the job did this accident happen, near the end, near the beginning, the middle?

A  Two-thirds as a guess.

Q  The signs that your crew was handling that day, I suspect that we -- those are signs made available by Keller?

A  Yes, sir. All traffic stuff was.

Q  Once Carlisle gives you guys a demonstration on how to handle the cones and signs, from that point forward your crew had control over that process. True?

A  Yes, until he would come remove cones or -- or, like I had mentioned before, the couple phone calls that we got.

MR. WOLLAM:  Responsiveness.

Q  (By Mr. Wollam) Once you had the instruction or the demonstration from Carlisle on how to do the work, on a day-to-day basis it was your crew that was placing traffic control. Correct?

A  Correct.

MR. HUDLER:  Objection; form.

Q  (By Mr. Wollam) They did it on a day-to-day basis without instruction from anyone

Page 34

other than themselves.  True?

MR. HUDLER:  Objection; form.

A  They would place the traffic control.

Q  (By Mr. Wollam) Right.

No one from Allen Keller was standing over them on a day-to-day basis instructing them on how to do it?

A  No, sir.

Q  We know that there are two occasions or two separate incidents where you've described cones being moved by Carlisle.  We've got that.  And there's the phone call event.

A  Yes, sir.

Q  All right.

A  The correction of our placement.

Q  Setting those aside, your crew's in control after Day One of the process of placing the traffic control?

MR. HUDLER:  Objection; form.

Q  (By Mr. Wollam) You can go ahead.

A  Yes.

Q  Okay.  Your crew was in control of -- on a day-to-day basis after Day One of picking the signs up, putting them in a vehicle and getting them to the location where they need to be placed?

Page 35

MR. HUDLER:  Objection; form.

A  Correct.

Q  (By Mr. Wollam) I'm going to presume - you correct me if I'm wrong - Carlisle did not give you instruction on how to place the signs in the bed of a truck.

That's something that's commonsense, and you just pick them up and put them in?

A  There was no telling us how to do that, no.  That was -- you have your job scope from here to here.  You line them up 500-foot each direction. We line our cones up like this (indicating).

Q  The process of picking up signs and putting them in the back of a truck is not complicated?

A  Other than taking them down and putting them up every day.

Q  So there is no control by Allen Keller over your men on a day-to-day basis placing signs in the truck?

MR. HUDLER:  Objection; form.

MR. SAWICKI:  Objection; form.

Q  (By Mr. Wollam) True?

MR. SAWICKI:  Same objection.

A  True.

Page 36

Q  (By Mr. Wollam) On the morning of the accident we've heard from Mr. Moreno, Allen Keller folks aren't even there yet?

A  Correct.

Q  I'm going to also presume - you correct me if I'm wrong - there was never any indication from Allen Keller about where your men should be riding in your -- in their crew truck while placing traffic control?

A  Correct.

Q  Can I see one of those exhibits?  Thank you, sir.

A  (Tenders.)

Q  Page 10 of 11, which is the contract between Allen Keller and C&B, and it's ten of 11 of the contract.  It's Bates labeled 17.  There's a safety checklist.

Is that your handwriting on the typed pages?

A  Yes, sir.

Q  Okay.  Explain to us what was involved in you filling out this document to attach as a -- to the contract or subcontract?

A  This is what we had to fill out to get the work.



Page 37

Q Okay. And I think -- what's the first item say? I think I've highlighted it.

A "Do you have an active safety program?"

Q Did you?

A Yes, sir.

Q And is it, as we heard Mr. Moreno explain here today, that there were some very specific rules that you all needed to follow?

A Yes, sir.

Q And that's information that he, sounds like, shared with his crew on a daily basis?

A Correct.

MR. SAWICKI: Objection; form.

Q (By Mr. Wollam) Is that correct?

A Correct.

Q What is your -- I've got to re-ask the question.

What is your understanding about how Moreno's crew received safety instruction on a daily basis?

A Verbally.

Q Okay. And did that safety instruction first start with you?

A Correct. I gave it to Roberto, and he interpreted it in Spanish.

Page 38

Q Were you present when these safety talks happened --

A Not all of them, but --

Q -- at the inception of the work?

A Yes, sir.

Q And when I say --

A If I --

Q -- say the work, I'm talking about the Blanco side of the work.

A Yes, sir.

Q So you were personally present when -- let me ask you this.

I assume Martin Suarez was at least an individual that you -- was aware -- were aware was working with Moreno's crew on the Blanco project?

A Yes.

Q Someone you knew by name or face?

A Yes, but not every day.

Q Got it.

And he would have been present when you were present and safety was being covered?

A Correct.

Q At least on one or more occasions?

A Yes, sir.

Q Did you ever discuss where your men should

Page 39

be with respect to the crew truck when moving up an down the roadway project located sic]?

A Yes.

Q And what did you tell them?

A Nobody in back of vehicles, nobody hanging on the sides. I mean, that road's very dangerous. I was worried about people getting run over. I mean, that -- you drive that stretch of road and try to do work on it. It was...

Q It's a curvey road?

A Very curvey road and not very large shoulders. We were very worried about people getting hit from oncoming traffic.

Q That did not occur?

A No.

Q The only tragedy was the one that befell Mr. Suarez?

A Correct.

Q I'll hand you that. Let me see that one, again, please.

A (Witness complies.)

Q The other items on your safety checklist included -- has safety -- "Has responsibility for safety been assigned to a specific top company official?" You have a Y down on that.

Page 40

I assume that person would be you?

A Yes, sir.

Q Okay. And then you passed that responsibility to Moreno, who was in charge of his crew?

A Correct.

Q And you also indicated that you did make frequent safety inspections on the project?

A Correct.

Q How often were you --

A Daily.

Q -- there?

Daily? There you go.

Did you ever see any of Moreno's crew members riding in the back of the pickup truck up and down the roadway project yourself?

A I did not personally, no, sir.

Q And I take it you certainly never saw any of the roadway crew in -- straddling the tailgate in the way that Mr. Moreno described it this morning?

A No, sir, I did not.

Q I think it's also safe to presume if you didn't see it happening, you certainly have no information that Allen Keller ever saw the men riding as Mr. Moreno described today, straddling the

Page 49

employees regarding the construction traffic signage.

Who performed that training on behalf of Allen Keller?

A To Roberto Moreno's crew, it was Paul.

Q When was it done?

A First day we started working --

Q Which --

A -- out there in Blanco.

Q -- which day was that?

A I would have to look back at my records. I --

Q If we're using --

A -- I can't recall.

Q -- if we're using this contract as a gauge --

A You can't --

THE WITNESS: I'm sorry.

A You can't do that, because the Fredericksburg job started right there around November. And Allen Keller did all the -- their -- all the traffic was done over there by them. And I don't recall a month before the accident. You can go with a date there, get you around there. But...

Q (By Mr. Sawicki) Prior to that point in

Page 50

time, then, had Allen Keller's employees set up the cones?

MR. WOLLAM: Form.

A That, I don't know. I wasn't there.

Q (By Mr. Sawicki) Prior to that time, had Allen Keller's employees set up the signs like what we see on Exhibits 3 and 4?

A Once again, I was not on that job prior to that.

Q Okay. With respect to what you've been told by your employees, prior to the point where the training was given on traffic control devices, who, to your knowledge, was responsible for placing the traffic control devices like what we see in Exhibits 3 and 4?

A You -- are we talking Blanco, are we talking Fredericksburg?

Q The job that had been ongoing before this training that you told me about performed by Mr. Carlisle?

MR. WOLLAM: Form.

A I -- I -- I wasn't there. I didn't never -- know if there was a sign up. That's -- the day we got there, we started working. I mean, that --

Page 51

Q (By Mr. Sawicki) Was the Fredericksburg work involving a roadway?

A Yes, sir.

Q Did it have any traffic control devices?

A Yes, sir.

Q Who was responsible for putting up the signage, the traffic control devices, for the Fredericksburg portion of the project?

A Allen Keller Company.

Q Okay. Why -- going back to Exhibit 5, I think it is, if that's what this one is -- yeah.

Where does it discuss that you would assume the responsibility for placing traffic control signs?

A There was never a contract on that.

Q Who gave you the instruction that you would assume that responsibility?

A To the best of my knowledge, it was Jim Brandenberger.

Q Who is Jim Brandenberger?

A He's an estimator at Allen Keller Company.

Q Why did Mr. Brandenberger bring that to your attention?

MR. WOLLAM: Form.

A He called me and said, "We can't get any

Page 52

traffic control. Can you do it and bill us?"

I said, "We don't have any equipment."

He said, "I've got all the stuff out there."

There we were.

Q (By Mr. Sawicki) What triggered that, if you have any recollection?

A Far as I know, he couldn't get the manpower --

Q And --

A -- is my understanding.

Q And had -- had someone other than Allen Keller employees been doing that in the past?

A That, I don't know.

Q When you say they couldn't get the manpower, was there some kind of change in the people working for Allen Keller at this time?

A I -- I don't know what the circumstances were on that.

Q Okay. Are there any records that you have regarding this change?

A Other than the first bill, no, sir. It was -- he just said, "Do the work and bill me." And I billed him, and he didn't agree on the price.

Q What -- what did he not agree on the

Page 53

price?

A   Said I billed him too much for a day's worth of work.

Q   What did you bill him for a day's worth of work on that?

A   Best of my knowledge, I think it was 515 a day.

Q   And what did he say -- what was his disagreement?

A   I believe he was -- he -- I can't say with complete certainty. I'm pretty sure he said they're used to paying 350 a day for it and that that was too high. So we worked it out.

Q   How did you ultimately work it out?

A   They gave us some material that we were actually using from them, which was called a Sonotube. They had a stack of them in the barn. We needed them to go around each post. And that was an amount of money that they had. They said, "Well, go to this, and we won't charge you for that." You know, we weighed it out.

Q   So you worked out a trade of some material with Allen Keller?

A   Correct, for a lower daily wage.

Q   And was that with Mr. Brandenberger --

Page 54

A   Yes.

Q   -- or Brandenberger, rather?

A   Jim Brandenberger.

Q   Jim Brandenberger.
    Now, the training that you described, do -- do you have any records of it actually having been done?

A   No.

Q   Do you have any -- were you present when it was done?

A   Yes, sir.

Q   How long did it take?

A   20, 30 minutes.

Q   Where was it done?

A   I believe it was on the very first guardrail on that job leaving Blanco. So it would be the first one on your left.

Q   Done at the roadside?

A   On getting set up for that day.

Q   Was it part of -- was the training merely placing the cones and the other signs out in the morning and saying, "Here's how it's done"?

A   Correct.

Q   Was it anything more than that?

A   No.

Page 55

Q   Was it --

A   Oh --

Q   -- done solely by Mr. Carlisle?

A   And his crew. He had some other people I didn't know, but they -- and then my guys started setting the cones out and they would tell them. And, you know, we all kind of jumped -- everybody jumped in there and he was saying, "Put your signs 500-foot apart to your flagger. Put your cones to here." And we started laying them out and that was that.

Q   Did the -- the other Allen Keller individuals, do you remember anything about who they were that were involved in this?

A   On Paul Carlisle -- Paul's crew?

Q   Yes, sir.

A   There was two girls is all I know, Mexican --

Q   Who were they?

A   That, I have no clue.

Q   What kind of job did they perform?

A   Workers. I mean, I really don't know. Paul was a blade guy and equipment operator. And they had one Mexican boy and --

Q   What is a blade guy?

Page 56

A   Motor grader. He's the guy that cuts -- I don't know.

Q   I guess what is Paul's role based on what you've seen --

A   I would say --

Q   -- on that --

A   -- Paul's role would be crew chief, same as Roberto, I would say, because there was a supervisor, Les Harvey, on the job.

Q   Does Paul speak Spanish?

A   No.

Q   Who translated for Paul's instructions for the members of your crew?

A   Roberto.

Q   Do you speak Spanish?

A   Very little.

Q   Do you know anything about how Mr. Moreno interpreted the instructions to the crew? In other words, we sat through -- you sat through the deposition a little earlier with the translator here for Mr. Moreno.
    Was it done that way?

A   No. He speaks English. Roberto speaks English.

Q   Correct.

Page 109

CAUSE NO. 13410

MARISELA G. SALAS,          *    IN THE DISTRICT COURT OF
individually AND AS         *
REPRESENTATIVE OF THE       *
ESTATE OF MARTIN SUAREZ     *
AND AS NEXT FRIEND OF       *
KEYLA MARIZEL SALAS         *
SUARES, minor               *
                            *
VS.                         *    GILLESPIE COUNTY, TEXAS
                            *
C&B WHITE SERVICES, INC.,   *
ALLEN KELLER CO., 1 LLC     *
d/b/a ALLEN KELLER CO.;     *
ALLEN KELLER CO. SAFECO     *
INSURANCE COMPANY OF        *
AMERICA                     *    216TH JUDICIAL DISTRICT

REPORTER'S CERTIFICATION
VIDEO/ORAL DEPOSITION OF CASEY WHITE
JANUARY 16, 2014

I, Rhonda Howard, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, CASEY WHITE, was duly sworn by the deposition officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the transcript was submitted on _____ to Mr. Zach Hudler, LAW OFFICES OF ZACHARY P. HUDLER, P.C., 100 East Pecan, Suite 1, Johnson City, Texas, 78656, (830) 868-7651, for the witness's examination, signature and return

Page 110

to me by _____;

That the time used by attorneys is as follows:

Mr. Erik Wollam - :39
Mr. Michael Sawicki - 1:07

That pursuant to information given to the deposition officer at the time testimony was taken, the following includes counsel for all parties of record:

Mr. Michael Sawicki, Attorney for Plaintiff
Mr. Erik Wollam, Attorney for Defendant, Allen Keller
Mr. Zach Hudler, Attorney for Defendant, C&B White Services, Inc.
I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

Page 111

Certified to by me, this 28th day of January, 2014.



RHONDA HOWARD, Texas CSR No. 4136
Expiration Date 12/31/14
FIRM REGISTRATION NO: 283
ESQUIRE DEPOSITION SERVICES
100 Congress, Suite 2000
Austin, Texas 78701
(512) 328-5557

Job No. 18143 RH

Page 112

FURTHER CERTIFICATION UNDER RULE 203 TRCP

The original deposition ( ) was ( ) was not returned to the deposition officer on _____.

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned the original deposition was delivered to Mr. Erik Wollam, Custodial Attorney;

That $_____ is the deposition officer's charge to the Defendant, Allen Keller, for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of the certificate was served on all parties shown herein and filed with the Clerk.

Certified to by me this    th day of          , 2014.

Rhonda Howard, Texas CSR No. 4136
Expiration Date:  12/31/14
FIRM REGISTRATION NO. 283
ESQUIRE DEPOSITION SERVICES
3101 Bee Caves Road, Suite 220
Austin, Texas  78746
(512) 328-5557

Job No. 18143 RH

 

ALLEN KELLER COMPANY
GENERAL CONTRACTORS
P.O. BOX 393
Fredericksburg, Texas 78624
Tel, 830-997-2118  Fax. 830-997-8428

## CONSTRUCTION SUBCONTRACT
Job # 535, Subcontract # 535-5
Blanco etc, STP 2010(879)SB, 1534-01-017 etc.

THIS AGREEMENT entered into this __2722nd__ day of November, 2011,

between _____Allen Keller Company_____, hereinafter called "General Contractor",

and __C & B Services Inc_ hereinafter referred to as Sub Contractor". Safeco Insurance

Company of America is "Surety" for previous General Contractor, Wiser Construction,

LLC. Texas Department of Transportation is hereinafter called "Owner" &/or

"Obligee".

The Sub Contractor mailing address, telephone number, and authorized contact are as
follows:        C & B Services Inc.
                P.O. Box 1007
                Johnson City, Texas, 78636
                (512) 402-4259
                Attn:   Casey White candbservicesinc@gmail.com

WHEREAS, General Contractor has entered into a construction contract
hereinafter called "Contract", with Owner for the performance of certain work consisting
of

Completion Contract for TXDOT Project STP 2010 (879) SB, Blanco etc, RM-1623
etc, Control 1534-01-017 etc

which said Contract, together with all contract documents, including plans, specifications
and addenda thereto, is by reference made a part and parcel hereof as fully and
completely as if set out at length herein; and (Including Contractor's Assurance
documents attached as "Exhibit B")

WHEREAS, the Sub Contractor represents that he is capable and experienced in
the type of construction hereinabove described, and will perform to satisfactory
completion the portion of said work hereinafter referred to and contracted to him.

NOW THEREFORE, it is hereby agreed between the Contractor and Sub Contractor as
follows:

1.      Sub Contractor agrees to undertake, assume and discharge the obligations of Sub
        Contractor, furnishing all materials, labor, tools, and equipment, whether owned or
        rented, in connection with and for the completion of that portion of the work
        described below and at the lump sum or unit prices specified below:

| Bid Item | Description | Est. Qty | Unit Price | Cost |
|----------|-------------|----------|------------|------|



See Attached "Exhibit A"

Page 1 of 11

Suarez v. Allen Keller
AKC 0008

said work is to be completed in accordance with the contract documents, including the plans, specifications and any addenda thereto of the Contract and to the full satisfaction of the Owner and its supervising agent as designated in said Contract, and

to make all payments for labor, material, equipment rentals or other charges when due.

2. The Sub Contractor will coordinate and schedule its work so that the work under this Contract Agreement may proceed without delay and in such a manner as to not interfere with or delay the work being conducted by the Contractor or any of its other Sub Contractors.

3. The Sub Contractor will take all necessary precautions to protect the finished work of the Contractor or other Sub Contractors from damage caused by the Sub Contractor's performance of the work.

4. The Sub Contractor will cooperate with the Contractor and other Sub-Contractors in the scheduling of Sub Contractor's work and shall notify the Contractor of any potential conflict or scheduling problems between the Sub Contractor's work and the work of the Contractor or any of its sub contractors.

5. Where certain quantities have been specified in the Contract and in the bid prepared by Sub Contractor to Contractor, it is understood that these quantities are approximate and that the Contractor and Sub Contractor are bound only to the extent that the Owner is bound in the estimation of such quantities.

6. It is understood that the work is to be done in the area and in the sequence directed by the Owner, or its agent, and that the Contractor shall not be responsible for any delays in Sub Contractor's work occasioned by direction of the Owner, or its agent, or the Contractor or any cause beyond the Contractor's control. Nor shall any claim be made against the Contractor for additional cost or damages as a result of any such delay. It being expressly understood that an extension of time properly requested by the Sub Contractor will be the Sub Contractor's sole remedy for any such delay.

7. Any claim of any nature whether for an extension of time or additional compensation for work completed by the Sub Contractor shall be filed with the Contractor within ten days from the occurrence of the cause for claim; otherwise such claim shall be void.

8. Work will begin immediately upon notification by the Contractor and will continue with reasonable diligence to its final completion.

9. Sub Contractor will promptly submit all shop drawings and samples required under the Contract in connection with Sub Contractor's work in an expeditious manner such that no delay will be caused in the progress of the work of Contractor or other Sub Contractors.

10. Sub Contractor warrants to Owner and Contractor that all materials and equipment furnished shall be new unless otherwise specified and that all work under this Contract shall be of the highest quality, free from defects and in conformance with the requirements of the Contract Documents. All work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective. This warranty shall be in addition to and not in limitation of any other warranty or remedy required by law or the Contract Documents and shall not be affected by payment or use by Owner for any portion of said work. Sub Contractor will remove and replace any defective work as determined by the Owner or its agent at any time during the course of Sub Contractor's performance under this Contract Agreement.

Suarez v. Allen Keller
AKC 0009

11.     Without invalidating this Contract, Owner or Contractor may order certain changes in the work within the general scope of this Contract which may consist of additions, deletions or other revisions, allowing for appropriate adjustment of the contract sum and contract time. No changes in the work or additional compensation to Sub Contractor will be allowed unless Sub Contractor has been directed in writing and in accordance with the requirements of the Contract to execute such changes.

12.     Indemnity: Sub Contractor agrees to assume entire responsibility and liability for any claim or actions based on or arising out of injuries, including death, to persons or damages to or destruction of property, sustained or alleged to have been sustained in connection with or to have arisen out of or incidental to the performance of this contract by Sub Contractor, its agents and employees, and its sub contractors, their agents and employees, regardless of whether such claims or actions are founded in whole or in part upon the alleged negligence of Allen Keller Company, owner, engineer, its representative, or the employees, agents, invitees, or licensees thereof. Sub Contractor further agrees to indemnify and hold harmless general contractor, owner, engineer, its representatives, and the employees, agents, invitees and licensees thereof in respect of any such matters and agrees to defend any claim or suit or action brought against General Contractor, owner, architect, its representative, and employees, agents, invitees, and licensees thereof. Sub Contractor also agrees to indemnify, defend and hold harmless General Contractor, owner, engineer, its representative, or its employees, agents, invitees, or licensees thereof from and against any and all loss, damage, expense, claims, suits or liability which Sub Contractor or any of its employees, and its sub contractors, and employees, may sustain or incur from the performance of this contract, or for or by reason of any injury to or death of any person or persons or damage to any property, arising out of the performance of this contract, of any claimed inadequate or insufficient safeguards or safety devices.

13.     Prior to beginning work Sub Contractor shall provide to Contractor satisfactory proof of insurance, in the form of a Certificate of Insurance endorsed with a Waiver of Subrogation in favor of Allen Keller Company and Owner and N/A, in the following amounts described below.

### INSURANCE:

1) Commercial General Liability (CGL) with limits of Insurance of not less than $1,000,000 each occurrence and $2,000,000 Annual Aggregate.

    a)    If the CGL coverage contains a General Aggregate Limit, such General Aggregate shall apply separately to each project.

    b)    CGL coverage shall be written on ISO Occurrence form CG 00 01 1093 or a substitute form providing equivalent coverage and shall cover liability arising from premises, operations, independent contractors, products-completed operations, and personal and advertising injury.

    c)    General Contractor, Owner and all other parties required of the General Contractor, shall be included as insureds on the CGL, using ISO Additional Insured Endorsement CG 20 10 11 85 or an endorsement providing equivalent coverage to the additional insureds. This insurance for the additional insureds shall be as broad as the coverage provided for the named insured Sub Contractor. It shall apply as Primary and non-contributing Insurance before any other insurance or self-insurance, including any deductible, maintained by, or provided to, the additional insured.

    d)    Sub Contractor shall maintain CGL coverage for itself and all additional insureds for the duration of the project and maintain Completed Operations coverage for itself and each additional insured for at least 3 years after completion of the Work.

2) Automobile Liability

Suarez v. Allen Keller
AKC 0010

a)     Business Auto Liability with limits of at least $1,000,000 each accident.
b)     Business Auto coverage must include coverage for liability arising out of all owned, leased, hired and non-owned automobiles.
c)     General Contractor, Owner and all other parties required of the General Contractor, shall be included as insureds on the auto policy.

### 3) Commercial Umbrella

a)     Umbrella limits must be at least $1,000,000.
b)     Umbrella coverage must include as insureds all entities that are additional insureds on the CGL.
c)     Umbrella coverage for such additional insureds shall apply as primary before any other insurance or self-insurance, including any deductible, maintained by, or provided to, the additional insured other than the CGL, Auto Liability and Employers Liability coverages maintained by the Sub Contractor.

### 4) Workers Compensation and Employers Liability

a)     Employers Liability Insurance limits of at least $500,000 each accident for bodily injury by accident and $500,000 each employee for injury by disease.
b)     Where applicable, U.S. Longshore and Harborworkers Compensation Act Endorsement shall be attached to the policy.
c)     Where applicable, the Maritime Coverage Endorsement shall be attached to the policy

### 5) Waiver of Subrogation

Sub Contractor waives all rights against Contractor, Owner and Engineer and their agents, officers, directors and employees for recovery of damages to the extent these damages are covered by commercial general liability, commercial umbrella liability, business auto liability or workers compensation and employers liability insurance maintained per requirements stated above.

### 6) Certificate of Insurance

Attached to each certificate of insurance shall be a copy of the Additional Insured Endorsement that is part of the Sub Contractor's Commercial General Liability Policy. These certificates and the insurance policies required shall contain a provision that coverage afforded under the policies will not be canceled or allowed to expire until at least 30 days prior written notice has been given to the Contractor.

14.     Sub Contractor will comply with all federal, state and local tax laws, social security acts, unemployment compensation acts and workers' or workmen's compensation acts insofar as applicable to the performance of this Contract and the employment of any person by the Sub Contractor. Sub Contractor hereby warrants certifies that all employees, subcontractors, or agents working under this Contract are legally authorized to work in the United States of America.

15.     The Sub Contractor affirms that all employees, contract labor and any Sub Contractor's employees will be paid not less than the Federal Minimum Wage as set forth in 29 CFR paragraph 206, or the wage rate schedule applicable to this project, whichever is higher. The Sub Contractor shall keep a copy of each payroll showing the name, number of hours worked each day, the occupation, and the wage rate paid each employee, contract labor and any Sub Contractor's employees together with a complete record of all deductions made from such wages. Upon request, the Sub Contractor shall submit copies of the payroll records to the Contractor. The Owner shall withhold payments due to the Contractor until the Contractor has complied with this provision, therefore Contractor shall withhold payments to the Sub Contractor until this contract provision is complied with.

Suarez v. Allen Keller
AKC 0011

16.    Sub Contractor will obtain and pay for all permits and governmental fees, licenses and inspections necessary for the proper execution and completion of Sub Contractor's work.

17.    Sub Contractor agrees to give all notices and comply with all rules, ordinances, statutes, regulations, orders, or decrees, that may be required or issued under any State or Federal Statute that are effective or applicable to the carrying out of this Contract; and to meet all of the requirements of the Owner whether required within the Prime Contract or under any law or regulation respecting labor priorities, maximum hours, scale of wages to workmen, or the method of payment and to furnish proper proof of compliance if and when required by law or requested by the Owner or the Contractor.

18.    Sub Contractor will, to the fullest extent permitted by law, indemnify and hold harmless Owner and Contractor and all of their agents and employees from and against any and all claims, damages, losses and expenses, including attorneys' fees, arising out of or resulting from the performance of Sub Contractor's work under this Contract whether caused in whole or in part by any negligent act or omission of Owner or Contractor or anyone directly or indirectly employed by them or anyone for whose acts they may be liable, and regardless of whether such claim, damage or loss is caused in whole or in part by any party indemnified hereunder.

19.    With regard to any and all claims against Owner or Contractor or any of their agents or employees by any employee of Sub Contractor, anyone directly or indirectly employed by him or anyone for whose acts he may be liable, the indemnification obligation provided herein shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for Sub Contractor under workers' compensation acts, disability benefit acts or other employee benefits acts or any other form of insurance carried or provided by Sub Contractor.

20.    Sub Contractor will take all reasonable safety precautions in the execution of his work and shall comply with all applicable laws, ordinances, rules, regulations and orders of any public authority for the safety of persons or property and shall, to the greatest extent allowed by law, indemnify Contractor for any fines, costs or damages, including attorneys' fees, which Contractor may incur because of violation of any such laws, ordinances, rules or regulations. Additionally, Sub Contractor shall abide by the provisions of the Allen Keller Company safety policy. A safety checklist is attached to this contract.

21.    Sub Contractor will report immediately to Contractor any injury to any of Sub Contractor's employees and any citation issued by any governmental or quasi-governmental body, including the Occupational Safety & Health Administration (OSHA) whether or not such violation or citation was made in connection with any injury.

22.    This Contract shall not be binding until Sub Contractor has furnished proper and acceptable payment and performance bond in the sum of $ 0.00.

23.    Payments hereunder shall be made to Sub Contractor within ten (10) days of such time as payment for that portion of the work is received by the Contractor from the Owner. It is expressly agreed that notwithstanding any other provisions herein, payment shall not be made to the Sub Contractor and Sub Contractor shall not be entitled to payment unless and until payment is received by Contractor for Sub Contractor's work. Receipt of payment by Contractor for Sub Contractor's work is an express condition precedent to Sub Contractor's right to payment. Sub Contractor hereby expressly assumes the risk of nonpayment to Contractor for Sub Contractor's completed work under this Agreement. Sub Contractor shall submit its monthly payment request on or before the 28th day of the month. Monthly payment requests shall include an invoice on the Sub Contractor's letterhead, and an Affidavit and Partial Lien Waiver (Exhibit), attesting that all bills owed by Sub Contractor to others for materials supplied or labor performed in connection with Sub Contractor's work

Suarez v. Allen Keller
AKC 0012

have been fully paid and satisfied. Invoices received after this date will be considered as the next succeeding month's business. Owner shall retain 5% of the gross amount of each monthly Payment Request or _5_ % of so much thereof as is approved for payment, whichever is less; such sum shall be accumulated and not be released to Sub Contractor until final payment is due. Monthly progress payments to Sub Contractor shall in no way imply approval of Sub Contractor's work. The Sub Contractor may be paid for materials stored on the job site, in a bonded warehouse, or at the Sub Contractor's facilities, provided as elected by Owner. Sub Contractor shall furnish detailed inventory, including invoices, for all stored materials for which Sub Contractor has requested payment. Sub Contractor acknowledges and agrees that its failure to make timely payments to its Sub Contractors, laborers, materials, men and suppliers shall constitute a material breach of this Agreement.

24. Owner shall make Final Payment to Sub Contractor after the work is complete and accepted by Owner providing that Sub Contractor shall have furnished Contractor with an Affidavit and Final Lien Waiver (Exhibit) and satisfactory evidence that all labor and material accounts incurred by Sub Contractor in connection with the sublet work have been paid in full. Final Lien Waivers and/or Suppliers Final Release Forms (acceptable to contractor) from each of Sub Contractor's sub contractors and suppliers shall constitute satisfactory evidence that all accounts have been paid in full. The meaning of provisions of the Contract, as it may be determined by any final judgement in or good faith settlement of litigation between Owner and Contractor, will control with respect to measurement, quantities and payment, including payment for extras, changes, and variations in plans and site conditions.

25. Sub Contractor will be bound to Contractor by the terms of this Agreement and, to the extent of the work covered under this Agreement, by the provisions of the contract documents between Contractor and Owner and Sub Contractor shall assume toward Contractor all of the obligations and responsibilities which Contractor, by those documents, assumes towards Owner. In the event of any dispute between Sub Contractor and Contractor, Sub Contractor shall have no greater right or remedy that Contractor has under the applicable contract documents against Owner.

26. In the event of any controversy respecting the fulfillment of the terms and conditions of the Contract concerning any of the work under this Contract Agreement, the decision of the Owner or its authorized agent shall be final and binding upon the Sub Contractor to the extent that same is binding on the Contractor under the terms and conditions set out in the Contract.

27. Sub Contractor agrees to clean up all of his work after the performance of same as called for by the Contractor or Owner, or its agent in charge of said construction project, and to protect his work against the elements and any hazards until he has finally completed same and same has been accepted by the Owner or its agent.

28. Contractor shall have the right after ten (10) days written notice to the Sub Contractor to terminate this Contract and take over all equipment, tools and machinery of Sub Contractor and the materials necessary for operating the same and to use them together with any selected part of the construction organization of Sub Contractor in completing this work or to assign the right to use same to any new Sub Contractor who may be designated and selected to complete the work as set forth in this Contract Agreement upon the occurrence of any of the following:

    (a) the refusal or failure of the Sub Contractor at any time to supply necessary material or equipment or a sufficient number of properly skilled workmen to carry out the work as directed by Contractor or Owner or the Owner's authorized agent, or

    (b) the failure of the Sub Contractor for any reason to carry out and perform the work under this Contract timely or maintain daily progress satisfactory to Contractor, or

Suarez v. Allen Keller
AKC 0013

(c)    the Sub Contractor makes any assignment of this Contract Agreement for the benefit of creditors without the consent of Contractor.

29.    Costs of completion of the Contract if terminated for cause under the foregoing paragraph shall be charged to Sub Contractor and an accounting shall be had when the work is finally completed to determine whether any amount is due from Contractor to Sub Contractor or vice-versa, and payments shall be made according to said accounting.

30.    In the event Sub Contractor is placed in bankruptcy or files for protection under federal bankruptcy laws, and ceases performance on the work under this Contract Agreement, Contractor reserves the right and Sub Contractor expressly agrees to allow Contractor to complete the work on Sub Contractor's behalf until such time as Contractor has received assurance from Sub Contractor that completion will be provided by Sub Contractor and that such costs of completion will be charged to Sub Contractor's account under the preceding paragraph.

31.    In the event of multiple Contract agreements between Contractor and Sub Contractor, and in the event of default by Sub Contractor on any such agreement, Contractor shall have the right to offset any costs for completion or other damages on any other Contract agreement against amounts otherwise due Sub Contractor on this Contract Agreement.

32.    In no event shall Contractor's liability for any claim of any nature whatsoever by Sub Contractor exceed the amount Contractor is entitled to receive and, in fact, does receive from Owner for such claim on behalf of Sub Contractor; it being Sub Contractor's responsibility to review claims procedures under the Prime Contract and to provide Contractor with sufficient notice so that such claims can be presented to Owner in a timely manner. All claims not presented within the requirements of this Contract Agreement and the requirements of the Contract are waived.

33.    It is agreed that Contractor may give Sub Contractor any notice required hereunder by depositing same, in writing, in the United States mail, postage fully prepaid, addressed to Sub Contractor at the address printed on the first page of this contract. Any notice Sub Contractor may desire to give Contractor will be deemed given if deposited in like manner, addressed to Contractor at P.O. Box 393, Fredericksburg, TX 78624. Either party may, by written notice, change the address to which future notices should be given hereunder..

34.    It is agreed that this Contract supersedes any and all prior negotiations, contracts, or agreements between the parties hereto with respect to the matters pertaining to the doing or performing of the work, described herein and that this Agreement constitutes the entire agreement of the parties.

35.    This Contract shall be subject to all of the applicable provisions of law now existing or hereafter enacted, or regulations of the United States of America, and neither party shall be liable for nonperformance if prevented and prohibited by any Federal Law or Federal Authority without contributing cause on the part of such defaulting party.

**Suarez v. Allen Keller**
**AKC 0014**

36.   Time is expressly declared to be of the essence of this Contract and all of its terms, covenants and provisions.

EXECUTED this __22nd__ day of _____ November _____, 2011.

WITNESS:

_____     By: _Jim Brandenberger_

                            _Jim Brandenberger_
                            Allen Keller Company

_____     By: _____

                            _Casey White_
                            C & B Services Inc.

Suarez v. Allen Keller
AKC 0015

Blanco etc, RM-1623 etc
TXDOT STP 2010 (879) SB, 1534-01-017 etc

## CERTIFICATE APPOINTING OFFICER TO SUPERVISE PAYROLL

NOTE: This certificate must be executed by an authorized officer of a corporation by a member of a partnership, or the sole owner and submitted with the first payroll. Should the appointee be changed, a new certificate must accompany the first payroll for which the new appointee executes a statement of compliance required by the Copeland Act.

Firm-
:_____ Date_____

Locality_____ Project_____ Contract No:
_____

I do hereby certify that I am sub-contractor on the above Project, and that I have appointed _Corey White_ whose signature appears below, to supervise the payment of my employees; I further certify that he/she is in the position to have full knowledge of the facts set forth in the payroll documents and in the statement of compliance required by the Copeland "Anti-Kickback" Act which he/she is to execute with my full authority and approval until such time as I submit to the Sponsor a new certificate appointing some other person for the purposes hereinabove stated.

Name: _Corey White_

Address _po Box 1007_

City _Johnson City TX_ State _TX_ Zip _78636_

Telephone _512 402 4257_

Signed: _____
 Identifying Signature of Appointee

Signed: _____ Title _pres._
 Appointing Officer

Suarez v. Allen Keller
AKC 0016

## SAFETY CHECKLIST

CONTRACTOR: _C & B Services Inc_

PROJECT: Blanco etc, RM-1623 etc, STP 2010 (879), 1534-01-017 etc.

1. Do you have an active safety program?                                     y

2. Does the program have the active and continued
   support of company management?                                            y

3. Has responsibility for safety been assigned to a
   specific top company official?                                            y

4. Do you make frequent safety inspections of
   operations of the project?                                                y

5. Do you discuss with your employees how to
   recognize and avoid unsafe conditions and
   practices related to their individual work
   assignments: i.e. hold safety meetings?                                   y

6. Do you have a hazard communication program
   with OSHA standards?                                                      y

7. Do you have an excavation safety program in
   accordance with OSHA standards?                                           y

8. Are all occupational injuries and illnesses investigated,
   recorded and reported?                                                    y

9. Do you keep informed on current governmental
   safety regulations and standards?                                         y

10. Note special requirements in Contract for TxDOT aviation projects may require
    special visibility and warning devices for working at airports. Sub Contractor is
    responsible to be familiar with and follow these requirements.

_____ (Pres)              12-6-11
Signature & Position                      Date

Suarez v. Allen Keller
AKC 0017

## SUB CONTRACTOR SUBMISSION CHECK LIST

1. FULLY EXECUTED SUBCONTRACT

2. PAYMENT AND PERFORMANCE BOND – N/A

3. EEO POLICY

4. SAFETY POLICY

5. CERTIFICATE APPOINTING OFFICER TO SUPERVISE PAYROLL (Above)

6. LETTER DESIGNATING POJECT MANAGER/FOREMAN, ~~TRAFFIC CONTROL RESPONSIBLE PERSON~~, ENVIROMENTAL RESPONSIBLE PERSON, EEO & SAFETY OFFICER, ETC.

7. SAFETY CHECK LIST (Above)

8. EMPLOYER IDENTIFICATION NUMBER _34-2343336_

9. CERTIFICATE OF INSURANCE

10. W-9

11. SHOP DRAWINGS, SAMPLES AND SUBMITTALS

Suarez v. Allen Keller
AKC 0018

*Exhibit A*

## C & B Services INC.

### Estimate

P.O. Box 1007
Johnson City, TX 78636
candbservicesinc@gmail.com
512.402.4259

| Name/Address |
| --- |
| Allen Keller Company |
| P.O. BOX 393 |
| FREDERICKSBURG, TEXAS 78624 |

| JOB |
| --- |
| TXDOT BLANCO CO. 1623 |

| Date | Estimate No. |
| --- | --- |
| 11/18/11 | 1384 |

| Description | Quantity | Unit | Rate | Total |
| --- | --- | --- | --- | --- |
| Mow Strip | 262 | CY | 265.00 | 69,430.00 |
| Curb and Gutter ( TY 2) | 158 | LF | 22.50 | 3,555.00 |
| 6" Concrete Paving | 210 | SY | 43.50 | 9,135.00 |
| Allen Keller to do all traffic control | | | 0.00 | 0.00 |

| Good for 30 days from estimate date. | | Total | $82,120.00 |
| --- | --- | --- | --- |

202